# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

LAMONTE CHARLES ARRINGTON,

      Petitioner,

v.                                                  Case No. 3:21-cv-22-TJC-MCR

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

      Respondents.

_____

## ORDER

### I.  Status

    Petitioner, an inmate of the Florida penal system, initiated this action by filing a Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus (Doc. 1). Petitioner challenges a state court (Duval County, Florida) judgment of conviction for attempted first-degree murder as a principal for which he is serving a thirty-year term of incarceration. See id. Respondents filed a Response (Doc. 6; Response) with exhibits (Docs. 6-1 to 6-7; Ex.). Petitioner filed a Reply (Doc. 7). This case is ripe for review.[1]

_____

[1] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." Jones v. Sec'y, Fla. Dep't of Corr., 834 F.3d 1299, 1318 (11th Cir. 2016) (citing Chavez v. Sec'y Fla. Dep't of Corr., 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief."

## II.    Governing Legal Principles

### A. Standard Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. See Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 642 (11th Cir. 2016), cert. denied, 137 S. Ct. 1432 (2017). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" Id. (quoting Greene v. Fisher, 565 U.S. 34, 38 (2011)).

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then

_____

Schriro v. Landrigan, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." Id. The Court finds that "further factual development" is unnecessary. Turner v. Crosby, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

> presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1), (2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has

3

> repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

## B. Exhaustion and Procedural Default

There are prerequisites to federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies available for challenging his state conviction. See 28 U.S.C. § 2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. Castille v. Peoples, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Pope v. Rich, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that Boerckel applies to the state collateral review process as well as the direct appeal process.").

4

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the ""opportunity to pass upon and correct" alleged violations of its prisoners' federal rights."' Duncan v. Henry, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting Picard v. Connor, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. Duncan, supra, at 365-366, 115 S. Ct. 887; O'Sullivan v. Boerckel, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999).

Baldwin v. Reese, 541 U.S. 27, 29 (2004).

A state prisoner's failure to properly exhaust available state remedies results in a procedural default which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> Federal habeas courts reviewing the constitutionality of a state prisoner's conviction and sentence are guided by rules designed to ensure that state-court judgments are accorded the finality and respect necessary to preserve the integrity of legal proceedings within our system of federalism. These rules include the doctrine of procedural default, under which a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state

> procedural rule. <u>See</u>, <u>e.g.</u>, <u>Coleman</u>,[2] <u>supra</u>, at 747–
> 748, 111 S. Ct. 2546; <u>Sykes</u>,[3] <u>supra</u>, at 84–85, 97 S. Ct.
> 2497. A state court's invocation of a procedural rule to
> deny a prisoner's claims precludes federal review of the
> claims if, among other requisites, the state procedural
> rule is a nonfederal ground adequate to support the
> judgment and the rule is firmly established and
> consistently followed. <u>See</u>, <u>e.g.</u>, <u>Walker v. Martin</u>, 562
> U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62
> (2011); <u>Beard v. Kindler</u>, 558 U.S. --, --, 130 S. Ct. 612,
> 617–618, 175 L.Ed.2d 417 (2009). The doctrine barring
> procedurally defaulted claims from being heard is not
> without exceptions. A prisoner may obtain federal
> review of a defaulted claim by showing cause for the
> default and prejudice from a violation of federal law.
> <u>See</u> <u>Coleman</u>, 501 U.S., at 750, 111 S. Ct. 2546.

<u>Martinez v. Ryan</u>, 566 U.S. 1, 9-10 (2012). Thus, procedural defaults may be
excused under certain circumstances. Even though a claim has been
procedurally defaulted, a federal court may still consider the claim if a state
habeas petitioner can show either (1) cause for and actual prejudice from the
default; or (2) a fundamental miscarriage of justice. <u>Ward v. Hall</u>, 592 F.3d
1144, 1157 (11th Cir. 2010). For a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective
> factor external to the defense that prevented [him] from
> raising the claim and which cannot be fairly
> attributable to his own conduct." <u>McCoy v. Newsome</u>,
> 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting <u>Carrier</u>,
> 477 U.S. at 488, 106 S. Ct. 2639).[4] Under the prejudice
> prong, [a petitioner] must show that "the errors at trial

---

[2] <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991).

[3] <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977).

[4] <u>Murray v. Carrier</u>, 477 U.S. 478 (1986).

> actually and substantially disadvantaged his defense so that he was denied fundamental fairness." <u>Id.</u> at 1261 (quoting <u>Carrier</u>, 477 U.S. at 494, 106 S. Ct. 2639).

<u>Wright v. Hopper</u>, 169 F.3d 695, 706 (11th Cir. 1999).

Without a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." <u>Carrier</u>, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001).

<u>Ward</u>, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting

Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. Schlup, 513 U.S. at 324.

### C. Ineffective Assistance of Counsel

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." Yarborough v. Gentry, 540 U.S. 1, 5 (2003) (per curiam) (citing Wiggins v. Smith, 539 U.S. 510, 521 (2003), and Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show that: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. Strickland, 466 U.S. at 687.

There is no "iron-clad rule requiring a court to tackle one prong of the Strickland test before the other." Ward v. Hall, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part Strickland test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." Id. (citing Holladay v. Haley, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in

8

Strickland: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

Further, "[t]he question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable - a substantially higher threshold." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at 105. As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting Strickland, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." Id. (citing Richter, 562 U.S. at 105); see also Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004).

### III.   <u>Relevant Procedural History</u>

The state of Florida charged Petitioner with one count of attempted first-degree murder of Nimley W. Nimley and a separate count of accessory after the fact to the attempted first-degree murder of Nimley. Ex. A at 57. At the conclusion of a jury trial, the jury found Petitioner guilty as charged on both counts. Ex. A at 84-85; Ex. D at 824. The trial court adjudicated Petitioner guilty of the attempted first-degree murder count only and sentenced him to a term of thirty-years imprisonment. Ex. A at 129-34; <u>see also</u> <u>id.</u> at 155-85 (sentencing transcript).

Petitioner, through counsel, filed a direct appeal raising four claims: (1) the trial court erred in denying Petitioner's motion for judgment of acquittal as to count one on the basis that there was legally insufficient evidence to convict him as a principal; (2) the prosecutor's misstatement of the law in the rebuttal closing argument amounted to fundamental error; (3) the trial court fundamentally erred by failing to instruct the jury that it could only convict Petitioner of one of the two mutually-exclusive charges; and (4) Petitioner's conviction rests on a legally inconsistent verdict and must be overturned. Ex. F. The state filed an answer brief, Ex. G, and Petitioner filed a counseled reply, Ex. H. The First District Court of Appeal per curiam affirmed Petitioner's conviction and sentence without issuing a written opinion. Ex. I.

Subsequently, Petitioner filed a pro se motion under Florida Rule of Criminal Procedure 3.850. Ex. L at 1-37. The postconviction court summarily denied Petitioner's motion, adopting the state's response thereto as its opinion. See id. at 38-132. Petitioner appealed, and the First DCA per curiam affirmed the postconviction court's denial without issuing a written opinion. Ex. O.

Petitioner then returned to the state trial court, filing a Rule 3.800(a) motion to correct an illegal sentence. Ex. Q. The trial court granted Petitioner's motion to the extent that count two – accessory after the fact – was dismissed. Ex. S.

Petitioner filed the instant case on January 5, 2021 (mailbox rule).

## IV.   Relevant Trial Testimony and Evidence

The following summary is taken from Petitioner's and the state's briefs on direct appeal.

> On the Saturday evening of September 6, 2014, about 10:30 p.m., a young man named Nimley W. Nimley (nickname of "Spicy") was shot multiple times some 26 seconds after an in-store surveillance film showed him exiting a 7-Eleven store located in Jacksonville Beach. The same surveillance recording also showed individuals, later determined to be Arrington [(Petitioner)] and Hilton-Washington [(Petitioner's co-defendant)], walking out of the store within a few seconds of Nimley. Specifically, Nimley had exited first, then Arrington, then Hilton-Washington. The 7-Eleven in question did not have any security cameras recording the grounds area outside the store. Therefore, the in-store recording did not capture the shooting incident itself, or capture

what transpired in the 26-second time gap leading up to the shooting. Six (6) spent .45 caliber casings were recovered at the scene. Five (5) of the recovered casings were submitted to FDLE for testing; and that testing determined the five (5) examined casings had all been fired from the same gun. Nimley survived, but was left paralyzed from the waist down.

Based on early investigative inquiry, the police learned the shooting victim had previously been inside the 7-Eleven. In the initial wave of interviews, none of the witnesses claimed to have seen the faces of any possible suspect or suspects,--but some clothing descriptions were given. Multiple cars reportedly left the scene. Some witnesses reported seeing an older-model, black 4-door car leave post-shooting. Others reported seeing a silver car screech off, post-shooting. The police also received conflicting information on whether there had been one shooter or two.

After viewing the in-store surveillance film, and speaking with Nimley and others, Detective Anthony Martin (of the Jacksonville Police Department) developed Defendant Arrington (nickname "Mayo") as a person of interest. Nimley had revealed that he recognized "Mayo", i.e., Arrington, as the individual Nimley's former girlfriend, Jessica Ennis, had cheated on him with. Nimley also said the unknown person who shot him was accompanied by Arrington. Detective Martin subsequently developed Defendant Hilton-Washington as a person of interest after learning he and Arrington were roommates. The surveillance footage showed Arrington to be an African-American male with dreadlocks, dressed in a dark shirt and camouflage shorts. In the video, Arrington was observed entering the store within a minute or so of Nimley having done so. Arrington entered the store virtually simultaneously with Hilton-Washington and a never identified Caucasian male. The surveillance footage showed Hilton-Washington to be an African-American male dressed

in a black shirt and khaki shorts. There appeared to be a bulge in Hilton-Washington's right front pocket.

On September 10, 2014, Detective Martin continued the investigation by going to Georgia to speak with Ms. Ennis. When shown still photos derived from the surveillance video, she identified Nimley, Arrington, and Hilton-Washington as all being inside the convenience store before the off-camera shooting event occurred. She also provided the detective certain Facebook communications she represented as occurring between her and Arrington.

A warrant search of the defendants' residence on September 11, 2014, produced the title to a black 4-door Mitsubishi car registered to Arrington. The title was seized since some early witness reports had mentioned that an older, black-colored 4-door car was observed leaving the scene. No gun related to the shooting was found in either the search of the house or car.

Nimley testified Jessica Ennis was a former girlfriend whom he had lived with in St. Mary's Georgia, back in 2013-2014. Through a friend of Jessica's, he'd gotten to know "Mayo", i.e., Arrington. He and Arrington would spend time together, and he was aware of the fact that Arrington had a black Mitsubishi automobile. Sometimes, Arrington would drive Nimley over to the Jacksonville Beach area where they would then socialize with some of Nimley's friends who lived there. Approximately two (2) months before the shooting, he had angrily severed his ties with Ms. Ennis and Arrington and moved back to the Jacksonville area after learning she was cheating on him with Arrington. Until such time as Arrington walked into the 7-Eleven on September 6, 2014, Nimley probably hadn't seen him since June or July of 2014. According to Nimley, the verbal interaction between he and Arrington within the store was limited to Nimley saying "What's up?"; Arrington responding

with "Do you want to step outside?"; and Nimley replying "Yeah". He had no verbal interaction whatsoever with Hilton-Washington. Nimley stepped outside first,--turning to his right in case he was about to get jumped and it became necessary to make a beeline toward a friend's nearby house. Within a few steps, Nimley looked over his right shoulder and saw Arrington running toward a little cutaway. He then looked for Arrington's companion and observed him pulling a gun out of his pocket. Nimley then began running as multiple shots were fired. A shot to his upper leg caused Nimley to drop to the ground. He was hit in the stomach by another shot. Then the shooter came over, stood over him, and put the gun to Nimley's head before pulling the trigger. Somehow, he managed to put his hand up in time to deflect the final shot so that the bullet only grazed his head. The shooter then ran off in the same general direction Arrington had gone. Nimley did not ever see a gun in Arrington's possession. Nimley did not see the shooter or Arrington drive off in any car. At trial, he made a positive identification of Defendant Hilton-Washington as the person who shot him multiple times. However, just 5 or 6 days post-shooting, Nimley had identified a completely different person as "that person [who] tried to execute me" when shown a photo array containing Hilton-Washington's photograph. One day later, after the police had him watch the in-store surveillance video, Nimley identified Hilton-Washington as the person who had shot him. Prior to September 6, 2014, Nimley had never met or even heard of Hilton-Washington.

> . . . .

Prosecution witness, Zachary Loizos, testified he was among the group of people, including "Spicy" [Nimley], who left Nick Harris' house and walked a block or two over to the nearby 7-Eleven store on the night of September 6, 2014. While inside, he heard "Spicy" say to someone in a loud, aggressive tone

words to the effect of "We'll go outside and handle our business." Based on the tone, volume, and tension level in the air, Loizos assumed a fight was about to break out between "Spicy" and the person he was addressing. He was on the verge of going outside to watch the expected fight when he heard multiple gun shots. When the shooting subsided, and Loizos ventured out, he saw Nimley lying wounded in the middle of the road by a stop sign. He waited with Nimley until emergency responders arrived. Loizos did not see the actual shooting, and he had no personal knowledge of who the shooter or shooters might be. He did witness a silver or gray car screeching away from the scene.

Prosecution witness, Ryan Morrison, testified that from a balcony of Bo's Coral Reef, his attention was drawn by the sound of popping noises. From a vantage point affording an unobstructed view, he saw two people chasing another person and shooting at him. Morrison believed one of the shooters was Caucasian. He also testified one of the shooters may have been wearing a hoodie. One kept running, but the other one doubled back to administer a "kill shot" to the person on the ground. The men ran off in slightly different directions.

Prosecution witness, James Domenico, testified he was smoking a cigarette on the balcony of his apartment at approximately 10:30 p.m. [on] September 6, 2014, when he heard gunshots. He retreated inside. Perhaps 30 seconds after the shooting subsided, he observed two men running. One, a shorter-haired African-American man, went to an older, black 4-door car before driving over to pick up a second African-American man. The second man was described as thinly-built with dreadlocks. When they left, the one with shorter hair was still driving the car. Domenico described the shorter-haired individual as wearing a black shirt and brown shorts. He could not remember what the other man was wearing. Domenico

did not attempt to make any identification of the individuals he had observed, and he acknowledged he didn't see the shooting and lacked personal knowledge of who the perpetrator(s) might be.

. . . .

Jessica Ennis testified she met Nimley in November of 2013, and had a 9-month romantic relationship with him which ended in July of 2014. For a time, they cohabitated at her house in Georgia. Multiple times a week, she would drive him to the Beaches area of Jacksonville and drop him off by the 7-Eleven store which was close to where his friend, Nick Harris, lived. In due time, she would return and pick Nimley up by the same 7-Eleven store. They had a "falling out" in July of 2014 when he discovered she had begun cheating on him with Arrington. Nimley was angry over this discovery due to a sense of wounded pride. He and Arrington had previously socialized together-including driving over to the Beaches area of Jacksonville. She was unaware of whether Nimley and Arrington "had words" with each other in the wake of the breakup. After the breakup, she had no further contact with Nimley.

Ms. Ennis and Defendant Arrington continued to see each other. Through him, she'd met "Cordy", i.e., Hilton-Washington, who was in the Navy. Arrington and Hilton-Washington lived together, both hailed from Baltimore, and called each other brothers. Though both men used the black Mitsubishi car, she believed the car was actually owned by Hilton-Washington. She first learned Nimley had been shot after reading a Facebook message Nick Harris posted about 11 p.m. on the night of the shooting. At no time did Arrington ever admit to any involvement in Nimley's shooting. In the several days that followed, she and Arrington exchanged a number of Facebook messages. Some were expressions of love and affection. Not long after her 7:32 a.m., 9/7/14, expression of

16

shock and dismay upon initially learning of Nimley's shooting, Arrington responded with "Well, don't worry, no one's gonna hurt you I will make sure of it." At 3:18 p.m. on 9/7/14, the Defendant sent the message "Be cool if police come you don't know anything and don't have anything to do with it if they keep talking and pressing u ask for a lawyer Your [sic] okay no ones going to hurt you." In response to her 9/7/14, 3:50 p.m. message of "Whatever I'm not going to argue with you about this. . . We have different views and morals"-she received a message saying "Wateva yo me and my bro ain't do nothing but show u love and help u out just because we care but not u compare me and him fuc all dat I don'[t wanna talk about this shit no more." The two exchanged various Facebook messages on a variety of subjects between 9/6 and 9/9. For example, Arrington expressed fear for his personal safety arising from concern that some of Nimley's friends might seek revenge based on the assumption he had something to do with the shooting. Ms. Ennis turned the Facebook messages over to law enforcement. She was aware of Arrington traveling to Baltimore to see his ill mother.

Defendant Hilton-Washington testified Arrington was his best friend. On September 6, 2014, they went to the Beaches area of Jacksonville just to enjoy the weekend day. Hilton-Washington drove Arrington to the Beaches area that night in the black Mitsubishi because Arrington had consumed some alcoholic drinks before leaving Georgia.  When at a Beaches area 7-Eleven, he noticed Arrington was talking to another person. He didn't know why Arrington was talking to the man, and he didn't know "Spicy" by face. Though Hilton-Washington did know that Arrington and a person named "Spicy" didn't care much for each other, he was unaware of any jealously problems between the two. While at the 7-Eleven, Arrington had done nothing to describe or point "Spicy" out to him. When Arrington chose to exit the store, Hilton-Washington followed. They walked back

to various bars located at the beach. He denied being armed. He denied that he and Arrington were involved in any shooting incident. He denied hearing any gunshots ring out after they exited the 7-Eleven.

Ex. F at 5-15 (internal record citations omitted).

The state agreed that the Petitioner's recitation of the testimony at trial was "generally supported by the record, subject to the supplementation that follows:"

> Jessica Ennis was Victim's ex-girlfriend. The two lived in St. Mary's, Georgia. Victim met [Arrington] through Ennis. At times, [Arrington] would drive Victim to Jacksonville Beach, Florida to hang out with Victim's friend Nick Harris. [Arrington] would drive Victim in [Arrington's] black Mitsubishi. Victim had neither met [Arrington's] co-defendant, nor known [Arrington] to affiliate with [Hilton-Washington].

> Victim came to learn that Ennis cheated on Victim with [Arrington]. After learning this, Victim moved back to Florida. On September 6, 2014, Victim was working at Walgreens, he had seen neither Ennis, nor [Arrington] since June or July. After work, Victim went to Harris' home and met up with some friends. Ultimately, a group from Harris' home went to the 7-Eleven nearby to get some refreshments. While at the 7-Eleven, [Arrington] and [Hilton-Washington] entered the store. Victim was shocked, and wondered what [Arrington] was doing in Florida. Victim said what's up to [Arrington], and [Arrington] asked if Victim wanted to step outside. Victim agreed to step outside the store. At the time Victim exited the store with [Arrington] and [Hilton-Washington], Victim

18

thought the worst that would happen is Victim would be jumped by the pair.

Victim testified to what occurred next as follows:

> Right when I step outside, I made that right turn, I probably took like maybe two steps each, and I kind of saw Mayo . . . kind of like running off from behind my right shoulder, I saw him going the other way, so I looked left to see where he was going, and after I seen him running for the little -- the little cutaway, I felt his friend still behind me on the other side. All this happened in a matter of seconds. So, I looked back to see over my right shoulder to see what his friend was doing, and as soon as I turned around, this guy was pulling out a gun out of his pocket.

Victim attempted to run away and was shot by [Hilton-Washington]. Up until this point [Hilton-Washington] had said nothing to Victim, and Victim had said nothing to [Hilton-Washington]. Victim testified he had "never met the guy" in his life.

After being hit, Victim was on the ground helpless. He then explained as follows: "He [Hilton-Washington] started walking directly towards me and he stood right on top of me and put the gun to my head." Victim put his hand up to block the shot, and the bullet only grazed him. Then, Victim heard the gun clicking, but it was either out of bullets or jammed because he was not shot anymore. [Hilton-Washington] ran off once he realized the gun was no longer firing. [Hilton-Washington] got into a black-four door car, picked [Arrington] up, and they drove away with their lights off--even though it was night.

Ex. G at 1-3 (internal record citations omitted).

## V. <u>Analysis</u>

### A. Grounds One and Two[5]

In Ground One, Petitioner argues that his trial counsel was ineffective for failing to object and/or request that the trial court instruct the jury "that it could only convict Petitioner of only one of the mutually exclusive offenses charged in counts one and two." Doc. 1-1 at 1 (some capitalization omitted). Petitioner contends that he was charged in count one "with acting as a principal in connection with the attempted murder of Mr. Nimley" and in count two, he "was charged with being an accessory after the fact to Nimley's attempted murder . . . in spite of the fact that the charged offenses were mutually exclusive, as a matter of Florida law." <u>Id.</u> In Ground Two, Petitioner contends that his trial counsel was ineffective for failing to object to the prosecutorial misconduct during closing arguments. <u>Id.</u> at 7. According to Petitioner, the prosecutor misstated the law and "erroneously instructed the jury that there was no inconsistency between being charged with being a princip[al] to attempted murder and being charged as an accessory after the fact." <u>Id.</u>

Petitioner raised these claims in his Rule 3.850 motion. The state court summarily denied the claims. Ex. L at 39. In doing so, the court adopted the

---

[5] In denying Petitioner's Rule 3.850 motion, the state court addressed these grounds together. In light of the state court's order and the similarities between the Grounds, this Court addresses them together as well.

state's response "as the factual and legal findings of the Court" and attached the state's response as an exhibit to the order. Id. The state's response addressed these two claims as follows:

> In Claim 1, the Defendant avers that counsel was ineffective in failing to object to [his] conviction for mutually exclusive offenses and/or failing to request that the Court instruct the jury that it could only convict the Defendant of one of the mutually exclusive offenses in Counts I and II.
>
> This claim is refuted by the record. In closing arguments, Defense counsel argued the very theory upon which Arrington rests in this motion before the court, that the jury could not return verdicts for both Attempted First Degree Murder, as a principal, and Accessory after the Fact. Thus, there is no ineffectiveness, as defense counsel did make argument regarding this issue.
>
> Relatedly, in Claim 4, the Defendant avers that counsel was ineffective for failing to object to closing arguments by the State, which encouraged the jury to return guilty verdicts as to both counts. Courts generally have deferred greatly to counsel's decisions whether to object or not during trial as a strategic one. The Supreme Court of Florida has ruled that judicious use of objections is not deficient where counsel chooses not to object as part of a style or strategy in order to avoid antagonizing the jury or losing credibility. Brown v. State, 846 So. 2d 114 (Fla. 2003).
>
> Accordingly, these claims may be summarily denied as the Defendant failed to identify acts or missions of counsel that were manifestly outside the wide range of reasonably competent performance under prevailing professional norms. Defense counsel's use of objections can be viewed as strategic, as the record reflects counsel did in fact make several

21

objections to misstatements of the law. Moreover, counsel did make argument regarding the dual offenses charged and urged the jury to reject both, both because they were inconsistent, but also because the State failed to meet its burden in proving either charge beyond a reasonable doubt.

Moreover, the record clearly indicates that, even if counsel had made no argument, the Defendant has suffered no prejudice due to the dual convictions.

The Supreme Court of Florida has held that a person convicted as a principal to a crime cannot also be convicted as an accessory after the fact to the same crime, since these two offenses are mutually exclusive. Donaldson v. State, 722 So. 2d 177, 184 (Fla. 1998). However, the Court has gone on to ratify the entry of judgment and sentence on the principal crime, so long as the accessory charge does not stand.

For example, in Staten v. State, 519 So. 2d 622, 623-24 (Fla. 1988), the appellant was convicted of second-degree murder, aggravated battery, armed robbery, and three counts of accessory after the fact. The Florida Supreme Court concluded that the legislature intended that the offense of accessory after the fact apply only to individuals who are not principals in the underlying offense. Id. at 626. The court noted that convictions for both offenses do not violate double jeopardy princip[le]s and that its decision was based only on its construction of the statute defining the crime of accessory after the fact. Id. at 625 (citing § 777.031 Fla. Stat. (1985)). The court reasoned that "a principal cannot also become an accessory after the fact by his or her subsequent acts." Id.; see also Bowen v. State, 791 So. 2d 44, 50 (Fla. 2d DCA 2001) ("[A] person cannot be convicted as both a principal in a crime and as an accessory after the fact to the same crime, and the crime of accessory after the fact cannot arise until the underlying crime is complete."). The Court then remanded the case only

for the trial court to vacate the convictions as to the accessory charge. Id. at 626.

Similarly, the Florida Supreme Court considered this issue in Branton v. State, 86 So.3d 560 (Fla. 2012), where the appellant was convicted of robbery with a firearm and three counts of accessory after the fact to robbery with a firearm. Relying on the analysis in Staten, the Court reversed and remanded the appellant's judgments and sentences for three counts of accessory for the trial court to vacate those judgments and sentences, but affirmed the appellant's judgment and sentence for the charge of robbery (as a principal).

In Arrington's case, the court did not enter a judgment nor sentence the Defendant on Count II, Accessory After the Fact, solely sentencing the defendant as to [C]ount I, and entering a judgment and sentence as to Count I. Thus, the Defendant is not faced with the dilemma of the appellants as discussed above.

The Defendant has cited Bazemore v. State, 79 So. 3d 828 (Fla. 2d DCA 2011)[,] in his motion for the proposition that had the jury been instructed on mutual exclusion, they would have only found him guilty of the lesser charge; however, the facts of that case are distinct from the facts of Defendant's case. The verdict form considered by the jury in Bazemore did not specify to which Victim the accessory charge related, and the appellant in that case was found guilty as to the murder of only one of the two charged victims. Id. at 830. The Second DCA, while acknowledging that there may be occasions where the trial court could select the greater offense for charging, felt that the confusion in the verdicts was too great to make such a selection. Id. at 830.

Here, the instructions, information, and verdict forms were clear that the jury w[as] to consider the

charges as they related to Defendant's actions towards the Victim Nimley. Thus, there is no confusion as was present in <u>Bazemore</u>, and this Court could be sufficiently certain, as acknowledged by the Second DCA, to sentence the Defendant on the higher count based on the strength of the evidence. Therefore, the court may summarily deny Claims 1 and 4, since the Defendant has failed to show a reasonable probability that would undermine confidence in the jury's verdict.

Ex. L at 56-58 (internal record citations omitted and citations modified). Petitioner appealed the denial of his Rule 3.850 motion, and the First DCA per curiam affirmed the denial without issuing a written opinion. Ex. O.

The Court addresses these claims in accordance with the deferential standard for federal court review of state court adjudications. Under Florida law, "a person convicted as a principal to a crime cannot also be convicted as an accessory after the fact to the same crime, since these two offenses are mutually exclusive." <u>Donaldson v. State</u>, 722 So. 2d 177, 184 (Fla. 1998) (citing <u>Staten</u>, 519 So. 2d at 625). Here, the jury rendered guilty verdicts on the attempted murder (count I) and accessory after the fact (count II) charges, but the state court only sentenced Petitioner on count I, eventually dismissing count II. Thus, although the jury found Petitioner guilty on count II, his conviction was never final as the state court never adjudicated him guilty or sentenced him on that count.[6]

---

[6] Even if the state court had sentenced Petitioner on both counts, it is likely the First DCA would have affirmed the attempted murder conviction and reversed and

The information, jury instructions, and verdict form all identified Nimley as the sole victim; thus, the jury was well aware they were to consider Petitioner's actions as it related to Nimley. The evidence supported Petitioner's conviction for attempted first-degree murder.[7] Given the jury's finding that Petitioner was guilty of attempted first-degree murder, they could not legally find that he was also guilty of accessory after the fact. Petitioner's counsel argued as such in his closing.

While counsel likely should have requested a clarifying instruction or objected when the state made a legally incorrect argument during closing, Petitioner cannot show that counsel's alleged failure to do so prejudiced him. Indeed, Petitioner has not shown a reasonable probability exists that but for counsel's alleged ineffectiveness, the outcome of his trial would have been

---

remanded for the trial court to vacate the accessory after the fact conviction. See Vowell v. State, 281 So. 3d 1294 (Fla. 1st DCA 2019) (affirming the appellant's murder conviction but reversing and remanding for the state court to vacate the appellant's conviction for accessory after the fact to the murder "because a person convicted as a principal to a crime cannot also be convicted as an accessory after the fact to the same crime").

[7] On direct appeal, Petitioner, through counsel, challenged the sufficiency of the evidence with respect to his conviction as a principal to the first-degree murder. The First DCA per curiam affirmed his conviction and sentence without issuing a written opinion. The record supports the state court's adjudication and thus, to the extent Petitioner seeks to challenge the sufficiency of the evidence supporting his conviction for count I, this Court defers to the First DCA's opinion. The Court finds that the state court's adjudication was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts given the evidence presented in the state court proceedings.

different. His contention that had the jury been instructed on the mutually-exclusive counts, they would have only convicted him on count II, if at all, is entirely speculative. And to the extent that Petitioner argues that his counsel's failure to object or request a jury instruction on this issue prejudiced him by taking away the jury's pardon power, "[t]he possibility of a jury pardon cannot form the basis for a finding of prejudice under Strickland." Sanders v. State, 946 So. 2d 953, 959-60 (Fla. 2006); Strickland, 466 U.S. at 694-95 (noting in determining whether prejudice exists, a court should presume the "jury acted according to the law," and "[a]n assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed.").

Thus, upon thorough review of the record, the Court finds that the state court's adjudication of these claims was neither contrary to, nor an unreasonable application of, clearly established federal law. Nor was the state court's adjudication based on an unreasonable determination of the facts given the evidence presented in the state court proceedings. As such, Grounds One and Two are denied.[8]

---

[8] Insofar as Petitioner argues the state postconviction court erred by failing to hold an evidentiary hearing, such a claim is not cognizable in a federal habeas petition. See

**B. Ground Three**

Petitioner argues that he was denied due process and the effective assistance of trial counsel when the prosecutor "knowingly utilized perjured testimony in violation of <u>Giglio v. United States</u>, 92 S. Ct. 763 (1972)." Doc. 1-1 at 13. He asserts that prior to trial, the victim and another witness testified that the victim asked Petitioner to step outside of the store, but during the trial, the victim testified that Petitioner was the one who suggested they go outside, and the prosecutor and Petitioner's trial counsel failed to correct this false testimony. <u>See</u> <u>id.</u> at 13-17. Petitioner acknowledges that he did not raise this claim in state court, but he requests this Court consider the claim under the narrow exception outlined in <u>Martinez</u>.

In <u>Martinez</u>, the Supreme Court recognized a narrow exception to the rule that an attorney's error in a postconviction proceeding does not constitute cause for a procedural default:

> Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

<u>Spradley v. Dugger</u>, 825 F.2d 1566, 1568 (11th Cir. 1987) ("Neither the state court's failure to hold a hearing on petitioner's 3.850 motion nor its failure to attach the relevant portions of the record in any way undermines the validity of petitioner's conviction," and thus "does not state a basis for habeas relief.").

27

Id. at 17. To establish cause under Martinez, Petitioner must demonstrate that the defaulted ineffective assistance of trial counsel claim "is a substantial one, which is to say that [he] must demonstrate that the claim has some merit." Id. at 14; see also Lambrix v. Sec'y Fla. Dep't of Corr., 851 F.3d 1158, 1164 (11th Cir. 2017). A claim is not substantial if it lacks merit or is wholly without factual support. See Martinez, 566 U.S. at 15-16.

First, insofar as Petitioner is raising a freestanding Giglio claim, his claim is procedurally barred. Petitioner failed to raise such a claim in state court, and the time in which to do so has now passed. He cannot show cause and prejudice to excuse his procedural default, nor has he shown a fundamental miscarriage of justice would result if the Court did not address his claim on the merits.[9] As such, any freestanding Giglio claim is procedurally defaulted and due to be denied.

Second, as to Petitioner's assertion that his counsel was ineffective for failing to object to this allegedly false testimony, the Court finds the claim is insubstantial. In arguing that Nimley provided a pre-trial statement indicating that Nimley suggested they go outside, Petitioner cites to Officer Martin's police report. See Doc. 1-1 at 13-14. As noted by Respondents, however, this police report is not in the record. See Response at 50 n.4 & n.5. The Court did locate a

---

[9] The Martinez exception only applies to ineffective assistance of counsel claims.

pretrial affidavit for arrest warrant, in which the officer averred that "[t]he victim [(Nimley)] stated that Arrington told him to 'take this outside.' Witnesses at the store confirm the statement made by Arring[to]n." Ex. A at 6 (emphasis added). Thus, the record before the Court does not reflect any inconsistent testimony from Nimley regarding who suggested they go outside.

Even assuming Nimley's trial testimony differed from a pretrial statement he made to police, such inconsistency could have been used as impeachment, but would not have changed the outcome of the trial in light of the entirety of the evidence presented. Moreover, during the state's closing argument, the prosecutor twice noted that Petitioner said to the victim, "Let's take this outside." Ex. D at 713 ("Or did they leave after Mr. Arrington tells the victim, Let's take this outside?"), 724 ("When Mr. Arrington says, Let's take this outside . . . ."). In the defense's closing argument, Petitioner's counsel used the discrepancy between Nimley's and another witness's testimony to show that the state had presented inconsistent evidence. See id. at 754 ("Mr. Nimley says that Mr. Arrington said, Let's go outside. But if you remember back to Mr. Loizos, he said that Mr. Nimley had the aggressive tone and he's the one that said, Let's handle this outside. . . . But why is that important? . . . [I]t's that you now have inconsistent evidence."). Then in rebuttal closing argument, the prosecutor said: "I don't care which one you want to believe, if Spicy said, Let's go outside, or if May[o] said, Let's go outside, they went outside." Id. at 775. The alleged

inconsistency simply was not material in light of the evidence presented, and thus counsel's failure to object did not rise to the level of ineffective assistance. Nor has Petitioner shown he was prejudiced by counsel's alleged ineffectiveness. Thus, the underlying ineffective assistance of counsel claim Petitioner raises is not substantial, and Ground Three is due to be denied.

Accordingly, it is

**ORDERED**:

1.      The Petition (Doc. 1) is **DENIED**, and this case is **DISMISSED with prejudice**.

2.      If Petitioner appeals, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[10]

---

[10] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.

3.     The **Clerk** shall enter judgment dismissing this case with prejudice, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 30th day of January, 2024.



TIMOTHY J. CORRIGAN
United States District Judge

JAX-3 1/21
c:
Lamonte Charles Arrington, #J55940
Counsel of Record